UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
RENSSELAER POLYTECHNIC INSTITUTE
and DYNAMIC ADVANCES, LLC,

                    Plaintiff,

vs.                              13-CV-633

APPLE INC.,

                    Defendant.

--------------------------------------------x

          Transcript of *Motion Hearing* held on

January 9, 2014, at the James Hanley Federal Bldg.,

100 South Clinton Street, Syracuse, New York, the

HONORABLE DAVID E. PEEBLES, United States

Magistrate-Judge, Presiding.


                    A P P E A R A N C E S

For Plaintiffs:     HARRIS BEACH LAW FORM
                    Attorneys at Law
                    333 West Washington Street
                    Syracuse, New York 13202
                      BY:  JAMES R. MULDOON, ESQ.

                    SKIERMONT, PUCKETT LAW FIRM
                    Attorneys at Law
                    2200 Ross Avenue
                    Dallas, Texas 75201
                      BY:  PAUL J. SKIERMONT, ESQ.

                    HESLIN, ROTHENBERG LAW FIRM
                    Attorneys at Law
                    5 Columbia Circle
                    Albany, New York 12203
                      BY:  NICHOLAS MESITI, ESQ.

```
For Defendant:        FENWICK, WEST LAW FIRM
                      Attorneys at Law
                      555 California Street
                      San Francisco, CA 94104
                        BY:  RYAN MARTON, ESQ.

                      MENTER, RUDIN LAW FIRM
                      Attorneys at Law
                      308 Maltbie Street
                      Syracuse, New York 13204
                        BY:  MITCHELL J. KATZ, ESQ.
```

*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

1     THE CLERK:  Case is Rensselaer Polytechnic institute, et

2  al. versus Apple Inc.; 13-cv-633.  Counsel, please note your

3  appearances for the record.

4     MR. KATZ:  Mitchell Katz; Menter, Rudin & Trivelpiece,

5  P.C., co-counsel for Apple Inc.  And with me is, I would like

6  to introduce, Ryan Marton from Fenwick, West, lead counsel

7  for Apple Inc.

8     MR. MARTON:  Good morning.

9     MR. MULDOON:  On behalf of plaintiff Dynamic Advances,

10 James Muldoon of Harris Beach.

11    MR. SKIERMONT:  On behalf of both plaintiffs Paul

12 Skiermont, and with me is Nicholas Mesiti, on behalf of RPI

13 as well.

14    THE COURT:  Good morning.  I have before me defendant's

15 motion to stay this proceeding pending disposition of an IPR

16 petition to the United States Patent and Trademark Office.

17 I'll hear your arguments.

18    MR. MARTON:  Should I argue from the podium?

19    THE COURT:  Yes, please.

20    MR. MARTON:  Good morning, Your Honor.  So this Court is

21 no stranger to the stay issue in the context of

22 reexaminations and IPRs, and there is a set protocol for

23 analyzing whether or not a stay should be granted, and the

24 Court has broad discretion in this context.  But what I think

25 is important is to look at why is the IPR process here?  And

1    it's within that backdrop that you need to analyze all of the

2    factors in order to evaluate whether or not a stay is proper.

3         The purpose of the IPR procedure is to establish a more

4    efficient and streamlined patent system that will improve

5    patent quality and very importantly limit unnecessary and

6    counterproductive litigation costs.  So, in order to achieve

7    that goal, we need to then evaluate whether or not the IPR

8    process will fit and streamline this case.

9         Here what we've got is procedurally we are about to

10   embark on the heavy lifting.  We're about to embark on claim

11   construction, dispositive motion and expert work.  And if we

12   stay the case now, we can benefit from the expertise of the

13   PTO and then proceed potentially in 18 months or less with

14   the case with the PTO's expertise in mind.

15        THE COURT:  You say 18 months or less, but are you

16   taking into account or failing to take into account the

17   possibility of an appeal to the Federal Circuit?

18        MR. MARTON:  Actually, different from the reexamination

19   process, the new IPR process the estoppel attaches as of the

20   final written determination from the PTAB, the Patent Trial

21   and Appeal Board.  Under the old reexamination process

22   estoppel didn't attach until the final determination and that

23   was through case law determined to be after the Federal

24   Circuit ruled.

25        THE COURT:  So if you lost in the PTAB and appealed, you

1  would agree that the stay in this case should be lifted

2  during the pendency of that appeal?

3      MR. MARTON:  We would need to evaluate the nature of

4  that loss.  I can't commit to that at this time.  However,

5  estoppel does attach as of that time.  So I think that's an

6  important factor.  And actually it has been an important

7  factor in other courts granting stays while IPRs are pending.

8      THE COURT:  Now, as you mentioned and as you know, we're

9  in the precipice of the claim construction exercise.  The

10  PTAB, if the IPR is accepted, the petition, will be

11  addressing validity and obviousness.  The PTAB won't be

12  making claim constructions.  So why shouldn't I go forward

13  with claim construction at least in this case while the

14  petition is pending?

15      MR. MARTON:  So the PTAB will not be making express

16  claim constructions; however, necessarily in every

17  communication between the patentee, the IPR petitioner and

18  the PTAB will be communications about the scope of the

19  patents and the prior art, that will inform claim

20  construction later.  It is essentially further prosecution

21  history that this Court can rely on for claim construction.

22      THE COURT:  You have, according to your reply papers,

23  now filed two additional IPR petitions?

24      MR. MARTON:  That is correct, on January 3rd.

25      THE COURT:  Can you explain to me how that works, why

1    there are three, and what, if any, effect it has on the

2    timing of the PTO's decision?

3        MR. MARTON:  Sure.  The additional two IPR petitions are

4    essentially expanded versions of the first IPR petition.

5    Apparently petitioners are allowed to file as many petitions

6    as they want as long as they are within the statutory time

7    period and are willing to pay the fee and can do repetitive

8    IPR petitions on the same prior art with the same arguments

9    but with expanded statements.

10       THE COURT:  So why are these timely if the complaint in

11   the original action was served in October of 2012?

12       MR. MARTON:  There is case law indicating that when --

13   so in this case Dynamic Advances' initial complaint that was

14   filed in October of 2012 was dismissed without prejudice.

15   There is case law in front of the PTAB that if a complaint

16   was dismissed without prejudice, it is a nullity.  And

17   therefore, it's Rensselaer Polytechnic Institute's June 2013

18   complaint that controls in determining the statutory time

19   period for filing IPR petitions.

20       THE COURT:  When was that served?  Or did you accept

21   service?  How did that work?

22       MR. MARTON:  When was RPI's complaint served?  I believe

23   it was sometime in June 2013.

24       THE COURT:  So there could be serial IPR petitions filed

25   as late as June of 2014?

1          MR. MARTON:  That is correct.  However, as of this time

2     Apple has no intention of filing further ones.  It now has

3     three on file with respect to the same prior art.

4          THE COURT:  Right.  So can you tell me in your

5     experience, because I'm not familiar with this and it's a

6     fairly new process, how will the Patent and Trademark Office

7     handle the multiple petitions?  Will they decide the October

8     petition separately from the January petitions, or will they

9     lump them together?  And does that give them an extension of

10    the six month deadline?

11         MR. MARTON:  So the PTAB has discretion here and it's my

12    expectation that they will consolidate all three of them.

13    And if plaintiffs actually respond to the January 3rd

14    petitions by the latter part of this month, which they

15    clearly are ready to do because they're preparing a response

16    to the earlier petition, then we would likely have all three

17    consolidated and proceed on the schedule that would follow

18    from the very first IPR petition.

19         THE COURT:  So the response would be due in that case by

20    the end of April?

21         MR. MARTON:  Yes.

22         THE COURT:  Okay.

23         MR. MARTON:  All right?  So, one of the important

24    factors, and I won't spend a lot of time on this, in the stay

25    analysis is whether or not the IPR will simplify issues for

1    trial.  It is a virtual certainty, regardless of what

2    happens -- if the IPRs are instituted, that what happens in

3    front of the PTAB will simplify issues for this trial.

4    Either claims will be deemed invalid and the entire case will

5    go away, or some claims will go away and others will proceed

6    and estoppel will preclude defendants from relying on certain

7    prior art.  And in any instance, we're looking at an improved

8    and increased prosecution history that this Court can rely on

9    for claim construction.

10        THE COURT:  There is obviously a split of authority and

11   courts have taken different views as to whether or not a stay

12   request of the nature that you're now making is premature

13   before the PTAB has acted on the petition.  Wouldn't the

14   Court be in a better position to know with certainty or be

15   able to predict with certainty the degree to which, if at

16   all, issues in this case will be simplified when we find out

17   whether or not the IPR is accepted and, if so, with respect

18   to how many of the 21 claims?

19        MR. MARTON:  Certainly.  This Court should evaluate the

20   nature and scope of the stay after the IPR petitions are

21   granted.  However, because of the stage of this case, we

22   think a stay, at least a preliminary stay for the next few

23   months, is warranted so we do not waste everyone's resources

24   on the claim construction.  They very likely will need to be

25   redone even if the IPR petitions are denied at this point.

1    Communications between RPI and Dynamic Advances and PTAB will

2    inform us further about their views on the claims and there

3    might be further disputes about scope and then the Court is

4    under an obligation to resolve those disputes.

5        THE COURT:  What can you tell me about the number of

6    claim terms that are in dispute and will be presented to the

7    Court?

8        MR. MARTON:  I think we are at ten per the local rules.

9        THE COURT:  And of those ten do they -- are they

10    pervasive throughout the 21 terms or claims or are they

11    limited, some limited to one or two or three claims?  And

12    what I'm driving at is if the PTAB invalidates three of the

13    21 claim terms in the end, will it materially affect claim

14    construction?

15        MR. MARTON:  Yes.  The vast majority of the claims in

16    dispute are pervasive throughout all the claims.  They arrive

17    out of the two independent claims and therefore apply to all

18    claims.  There are some terms in dispute from dependent

19    claims that are less important.

20        THE COURT:  Okay.  So tell me -- well, obviously, you

21    rely heavily on the cases that suggest that a hiatus of up to

22    six months in the prosecution of the infringement claims is

23    justified by the benefit to be gained if the IPR is granted.

24        MR. MARTON:  Yes.  Yeah.  There are numerous cases,

25    mostly from the Northern District of California, that take

1    that position.  Two that I'm sure that the Court is well

2    aware from our briefing but I'll mention are the *Software*

3    *Rights Archive v. Facebook* case.  I think that case is pretty

4    much the same as this case.  And then the *Evolutionary*

5    *Intelligence versus Yelp* case both from this year.

6        THE COURT:  Are there any more available statistics

7    since those that were cited in the initial moving papers?

8        MR. MARTON:  Not that I'm aware of.  Not that I'm aware

9    of.

10       Now back to the issue of a six-month delay.  Neither

11   Dynamic Advances or RPI practiced the claimed invention.

12   We're not talking about competitors that are going to suffer

13   harm in the marketplace here.  Indeed, as far as I know,

14   Dynamic Advances was formed to file this lawsuit.  They exist

15   only to sue Apple on this patent.  And there just isn't

16   urgency here.  This is just about money and they'll recover

17   it when they recover it.

18       And if you look at the history of this case, the

19   plaintiffs are not prosecuting it tremendously aggressively

20   and particularly right now, and I believe they expect a stay

21   will ultimately be granted in this case at some point if not

22   now.  They pushed hard for depositions in this case.  We,

23   Apple, gave 12 witnesses, made 12 witnesses available on

24   dates from December to February.  Plaintiffs have withdrawn

25   and refused to take all but two of those depositions.  In my

1    view they're waiting to see what happens.  This doesn't show

2    urgency.

3        THE COURT:  Why did Apple wait nearly a year from the

4    filing of or service of the earlier Summons and Complaint to

5    request IPR?

6        MR. MARTON:  The decision to file an IPR, because of the

7    rigid estoppel provision, is a very difficult one, and it

8    cannot be fully evaluated until you begin to understand the

9    patentee's claim construction positions, how they understand

10   the scope of the patent.  So we needed to wait for

11   infringement contentions, which unfortunately in this case

12   were, they were served in March of 2013, they were not

13   particularly illuminating.

14       It wasn't until we received their claim construction

15   positions in June of 2013 that we got a better understanding

16   of how they saw this patent to apply.  And then we needed to

17   dig to make sure we had exactly the best prior art for the

18   IPRs.  It takes time.  A petition, it's a sixty-page filing

19   but accompanied with a tremendous expert report that takes a

20   lot of effort to make.  So we utilized our full statutory

21   period which we have a right to do.

22       THE COURT:  Why did you wait two additional months to

23   request a stay?

24       MR. MARTON:  We actually did not wait two months to

25   request a stay.  We did first request a stay I think just

1    about one month after we filed the petition.  Again, we had

2    worked very hard to get the IPR petition on file and had not

3    fully evaluated whether or not it was appropriate to request

4    a stay now or to wait until it was granted.  Under the old

5    regime, under the reexamination process, it was pretty much

6    standard to seek reexamination after it had been -- I mean to

7    seek a stay after the reexamination had been instituted.  We

8    see a trend here in the case law that supports a stay at this

9    point and so sought one as quickly as we were comfortable

10   with doing so.

11       THE COURT:  Plaintiffs have criticized the fact that a

12   telephone conference was conducted in this case after the

13   initial petition was filed and there was no mention made of

14   it during the conference at which we discussed certain

15   discovery related issues.  How do you respond to that

16   criticism?

17       MR. MARTON:  Easily.  That was the -- I believe it was

18   the day -- the conference was the day after we had actually

19   transmitted the IPR petition.  We had not yet received an

20   indication that we had gotten the filing date.  So

21   technically it hadn't been filed as of that time, so it was

22   premature to even mention it.  It is public information,

23   however.  Once these things are filed, it becomes public.  We

24   weren't trying to hide something.  But as of that time there

25   wasn't a point in mentioning it.

1      THE COURT:  And lastly, at least the last question I

2   have for now, the plaintiffs have submitted an expert

3   declaration and, in essence, invited me to look behind the

4   petition and make some sort of assessment as to the

5   likelihood that IPR would be granted, and if it is granted,

6   that all or some of the 21 claims will be invalidated.  Is

7   that something that you believe is appropriate or not

8   appropriate?

9      MR. MARTON:  I don't think it's appropriate.  I have not

10  seen another court do so.  I also have seen at least one

11  court expressly decline to do so.  It's cited in our papers

12  and I believe it was a case against Apple.  I can't remember

13  who the plaintiff was.

14     THE COURT:  Okay.  Anything further you would like to

15  raise?

16     MR. MARTON:  No.  No.  Thank you.

17     THE COURT:  All right.  Thank you.  Who is going to

18  argue?  Mr. Skiermont?

19     MR. SKIERMONT:  Yes, Your Honor.  I'm going to hand up a

20  couple of items.  How many items?  One for you, one for your

21  clerk?

22     THE COURT:  Do you have two, that would be fine.  What

23  are these?

24     MR. SKIERMONT:  These are a screen shot from the IPR

25  petitions that Apple recently filed.  It's in their exhibits

1    to their reply brief.

2        THE COURT:  So these are already in the record?

3        MR. SKIERMONT:  The Apple document is already in the

4    record.  The timeline is a demonstrative based on facts that

5    are in the record.  And the third page is a concurring

6    opinion from a denial of rehearing en banc in the Federal

7    Circuit that relates to the timeline issue that I'm going to

8    address.

9        THE COURT:  So should these be docketed so that we have

10    a complete record?

11        MR. SKIERMONT:  Yes, Your Honor.  If we could mark them

12    as exhibits to this hearing, Plaintiffs' Exhibit 1 would be

13    the PowerPoint, and Plaintiffs' Exhibit 2 would be the

14    excerpt of the denial of hearing en banc, and 3.

15        THE COURT:  Excellent.

16        MR. SKIERMONT:  Your Honor, I would like to begin with

17    the issues related to the timeline and Apple's second and

18    third petition that were filed the day we served our

19    opposition brief to the motion to the stay but then we were

20    served on the following Monday with the second and third

21    petitions.  And you had some questions about those and I

22    would like to also address those and put in the context the

23    meaning of those.

24        So, RPI will object to the second and third petitions.

25    In fact, we already sent an e-mail.  Counsel has communicated

1    with the Board.  We have explained to the Board that we think

2    the second and third petitions are untimely because they were

3    filed one year after Apple was served with the complaint

4    alleging infringement of RPI's '798 patent.  And Apple has an

5    argument there is a case, we think they're focusing on the

6    wrong fact in the PTAB case.  There is a case that says a

7    dismissal of a lawsuit without prejudice renders the filing a

8    nullity.  What it actually says is the reasoning is that a

9    dismissal without prejudice in that case was as if the

10   complaint was never filed.  That's not an exact quote from

11   the PTAB's decision, it's close.

12        In that case what happened is the patent holder sued a

13   foreign parent entity and that was dismissed without

14   prejudice, and then they went after the American subsidiary

15   over a year later, and the PTAB said that the clock did not

16   run and they were not out of time based on the filing against

17   the foreign parent.

18        Here we're in a completely different situation.  What is

19   in common is that there was a dismissal without prejudice.

20   What is different is that the dismissal without prejudice was

21   not as if the complaint had never been filed.  In fact, a

22   condition of the dismissal was that everything from the first

23   case be adopted into the second case.  And what was affected

24   there was more of a merger than a dismissal of a case as if

25   it had never been brought.

1        In any event, these are arguments we'll be making before

2   the PTAB in trying to get the second and third petitions

3   dismissed as untimely.  What we've sought is a request from

4   the Board to tell us how to do it.  Do we have to wait for

5   our preliminary response to raise this issue or will they let

6   us brief it separately as a threshold issue is basically what

7   we're seeking their input on.  So, that's one of the issues

8   that arise from Apple's second and third IPR petitions.

9        The other issue that arises from those petitions is this

10  issue of joinder, and there is another potential argument

11  related to the one year deadline and joinder where there

12  appear to be circumstances anyway where joinder has been used

13  and been permitted to basically allow an end run around the

14  one year.  They're fact specific.  We don't know how the PTAB

15  will address joinder in this specific instance, but that is

16  an issue.

17       And which kind of comes to the first slide or the first

18  page of material in Exhibit 1, Plaintiff's Exhibit 1 to the

19  hearing, that is entitled Plaintiff's Opposition to the Stay.

20  If you turn to page 2, Your Honor, entitled Apple Requests

21  the USPTO to Defer on and Offers to Withdraw Its First

22  Petition.  This is something Apple's brief noted in the

23  footnote that they filed the second and third petition.  This

24  excerpt, this paragraph is from page 4 of Apple's motion for

25  joinder of the proceedings where they're seeking to join all

1   three of the IPRs.  And you can see in the highlighted text

2   Apple says that they request that the Board consider the new

3   petitions and they request that the Board defer consideration

4   of the original petition.  And in addition, if the Board

5   believes it appropriate, Apple said it would be willing to

6   withdraw its earlier filed petition in the first one in favor

7   of its second and third filed petitions.

8        And so to RPI this is exactly the problem or is one

9   illustration of many problems of staying this litigation for

10  IPR proceedings, is that we have no idea at this point now

11  that there are three and joinder sought and there is going to

12  be motion to dismiss practice on number two and three, we

13  don't really know.  But there is authority for the idea that

14  if the PTAB takes Apple up on its offer and kicks the first

15  one or merges them all together, that the decision on

16  institution of all of these IPRs will be delayed where it is

17  now expected to come in April, which is roughly six months

18  after it was filed and will be roughly three months after RPI

19  files its preliminary response.  So we would have expected

20  the IPR's decision on institution April 2014.

21       The new IPR petitions put even that date in some limbo.

22  And, in fact, there is some chance that if they join, if the

23  PTAB joins all of the petitions together, that the decision

24  on institution may not come until July of 2014, so a couple

25  of months later or a couple of months elapsed between the

1    first filing and their second and third filing.

2        So, which is the second page of Exhibit 1 is the

3    timeline.  And we made this argument in our brief, we talked

4    about above the line and from our brief, or the lower red

5    boxes where we were mapping out the timeline based on Apple's

6    first filed IPR petition where a decision on institution is

7    anticipated in April 2014, a final decision from the PTAB in

8    April 2015.  And, of course, that date is not iron clad.

9    They can get a six month, the PTAB does have the ability to

10   get a six month extension from an April 2015 date.  We're

11   presuming 12 months but it's 12 to 18 is the law.  And then

12   through the appeals process brings it out to February 2016

13   based on the first filing.

14       And then the darker red boxes above the line show the

15   effect, the potential effect of the second and third filed

16   IPR petitions if they're timely, if there is joinder.

17   Essentially it means that the IPR process could extend out

18   another two or three months even than what we were describing

19   in our brief based on the first filing.  Below the line on

20   page 3 of Exhibit 1 is a roughly estimated and admittedly

21   aggressive schedule for the litigation but it comes from

22   someplace.  This was in our brief as well where we cited to

23   the Apple and Dynamic Advances original scheduling order.  We

24   cited to the actual scheduling order that was adopted and

25   what the initial agreed order that the two parties put in

1    contemplated an April 2014 trial date.

2        What has happened with some of the extensions and

3    whatnot is essentially the schedule.  The opening claim

4    construction briefs have moved six months from that schedule

5    that the parties submitted as an agreed scheduling order.

6    So, if you move the schedule that was agreed six months out,

7    that puts us at an October 2014 trial date.

8        Remember, claim construction briefs, one of the points

9    that counsel made and is made in Apple's brief is that we

10   should put the brakes on because we're getting ready to

11   really jump into claim construction.  We jumped in.  The

12   inventor was deposed and prepared.  The claim construction

13   opening briefs of both parties are due a week from tomorrow.

14   So nobody's sitting around and waiting to see what happens

15   today before they write a brief.  All that work is going.

16       Claim construction discovery is closed and briefs are

17   due in a week and there will be a hearing that's scheduled in

18   a couple of months, and then you have some remaining fact

19   discovery that the parties will take and then we're into

20   experts, which is, as you know, in a patent case is one of

21   the central discovery events but it can happen in three to

22   four months.

23       So, anyway, the fact that we -- the importance of the

24   timeline and what the -- where we would be if there is an

25   indefinite stay until the IPR reaches conclusion or even if

1  the IPR reaches a final written decision from the Board

2  triggering collateral estoppel, there is no waste of

3  resources, no issue related to collateral estoppel, that none

4  of the parade of horribles from Apple's perspective from

5  denying a stay come into play at all if this litigation

6  finishes before the IPR finishes.

7      THE COURT:  I think your timeline on proceedings of this

8  Court is a little ambitious.  But let's say that this case

9  goes to trial during the pendency of an IPR proceeding before

10  the PTAB, invalidity based on the anticipation of obviousness

11  would be presented.  It would be defendant's burden to

12  establish by clear and convincing evidence those defenses.

13  And suppose they fail.  You succeed in establishing

14  infringement.  You recover a judgment.  And then the PTAB

15  which now applies a preponderance of the evidence standard in

16  its expertise disagrees with that finding and concludes that

17  all or some of the claims should be invalidated.  Haven't we

18  wasted a great deal of time and energy?

19      MR. SKIERMONT:  No.  No, Your Honor, we have not, and

20  that is why I handed up the *Baxter* opinion along with the

21  timeline because I was going to focus on the timeline and

22  thought that might be a major concern.  But what happened in

23  the *Baxter* case is it was a reexam.  Obviously, almost

24  everything everyone's citing or talking about is reexam.  A

25  brave new world, there has only been one final IPR

1  proceeding, which is a notable point.  This die has not been

2  cast, and we're making the law now about what to do in stays

3  and IPRs and what people think the America Invents Act did to

4  empower either accused infringers or patent holders and

5  whether that's meaningful.  And that's an important point I

6  want to talk about with respect to collateral estoppel.

7      What happened in *Baxter* was the patent holder sued

8  infringer, went to trial, patent valid, infringed, judgment

9  of damages.  Basically exactly how you just laid out the

10  timeline that could happen here.  During the pendency of

11  *Baxter I* the defendant filed for a reexamination.  Four years

12  later the reexamination emerged, the patent office

13  invalidated all the claims, and the patent holder argued,

14  well, basically you can't do that because we already went up

15  on appeal to the Federal Circuit and they affirmed the

16  validity, and so you can't in the reexam context affirm

17  invalidity.  And the Federal Circuit rejected that argument

18  wisely because there are different standards in district

19  court litigation and before the PTO.  It's presumed valid

20  here, invalidated by clear and convincing evidence, not

21  presumed valid in front of the reexam, et cetera.

22      So, the patent holder -- actually, I don't remember if

23  it was the patent holder or the accused infringer moved for

24  the hearing en banc in *Baxter II*, and it was denied in what I

25  handed up in Judge O'Malley's concurring opinion in what is

1    *Baxter III*.  And what is important about *Baxter* is that the

2    scenario you just described does not actually present a

3    problem to anyone except potentially Apple who will be on the

4    hook for a final judgment that is final and cannot be

5    reopened.  And it is true that later the patent office after

6    a Federal Circuit affirmed a finding of infringement, no

7    invalidity.  Because you don't prove a patent's validity, you

8    establish that Apple didn't prove that it was invalid.  And

9    damages.  And there can be a judgment and it can be final,

10   appeal to the Federal Circuit, final.  And even if a month

11   later, or three months later, or a year and a half later, the

12   IPR that's been late filed and joined into three, it

13   eventually meanders its way up the appellate ladder and the

14   Federal Circuit says, you know what, on the standard where

15   there is no presumption of validity and whatnot, we affirm

16   the PTAB's hypothetical finding that the patents are invalid.

17        Well, that means RPI couldn't assert that patent any

18   more, the patent is dead as against everyone except Apple,

19   because RPI would have a final judgment of infringement, no

20   invalidity and damages.

21        So the point that is essential in RPI's view in

22   particular is that to stay a case for what could amount to

23   years when we can litigate all these issues and be done, have

24   the appellate decision and be on our way, there might be a

25   waste of resources but it will be up to Apple as to whether

1  they make a judgment that they want to keep fighting in the

2  PTAB when it's unlikely they're going to get to finality

3  there before they get to finality here.

4      THE COURT:  But is the scenario you just described, is

5  that a just result?

6      MR. SKIERMONT:  Yes.  Because of the two different

7  standards that are at issue.  There is -- right now they're

8  basically -- because they filed a petition for IPR that has

9  not yet been instituted, as if that's somehow changed the

10 statutory presumption of validity.  The PTO experts, at least

11 one of them, has already looked at the claims that RPI is

12 asserting against Apple, and those experts issued the claims

13 over prior art and back and forth arguments about whether the

14 prior art invalidated.  They spent four pages lauding the

15 expertise of the PTO and the only thing we know about what

16 the PTO thinks of that patent today is that they issued it in

17 all 21 claims.

18     It is not an unjust result to take a presumptively valid

19 patent, to sue an infringer and to not have to wait and do

20 nothing for three years because they challenged the patent

21 after a year delay and then moved to stay 14 months after

22 they were sued.  There is some control that Apple had over

23 whether we could even entertain the discussion about whether

24 there is a shot we could get to finality before the IPR gets

25 to finality.  Here because we're on the eve of claim

1  construction, the inventor has been deposed, we've been doing

2  this for a year.  We deposed one of the Siri founders.  We

3  reviewed their source code.  We're ready to go.

4      We need to get the documents that Apple has not produced

5  yet that we anticipate will show what Apple expected the

6  value of Siri would be to Apple, which will be our damages

7  theory called the empirical model.  And those documents we

8  don't have.  We need to prove up our damages case.  But other

9  than that, it's an expert on infringement and validity and

10  we're at trial before the jury.

11      And there are certainly circumstances, as I think we

12  noted in our brief, where this could happen differently and

13  we could be at a different hearing where you would say,

14  counsel, you're crazy, there is no chance that this

15  litigation is going to go to trial and be final on appeal

16  before this kind of super charged or faster, the idea was

17  that it would be faster, new inter partes review process

18  kicks in.  This would be an entirely different conversation,

19  I would think.  But because we are where we are in the

20  litigation and the IPRs are where they are, which is in

21  limbo, RPI's view is we don't need to wait for the PTAB or

22  the PTO on these IPRs.  And, frankly, collateral estoppel --

23  and this is where I wanted to get into about the America

24  Invents Act and assumptions that are made in the stay

25  motions.  It's obvious -- it's easy to understand why the

1    defendants have to be careful about collateral estoppel in an

2    IPR.  And it is a strategic position, no question about that.

3    But from a patent owner's perspective, these collateral

4    estoppel rules look like fool's gold, because they're really

5    not going to change much at all in virtually any scenario in

6    which there are still claims after an IPR.

7        For example, the IPR proceeding is not 102 anticipation,

8    103 obviousness.  It's limited to 102 and 103 arguments based

9    on printed publications, period.  If it's not a printed

10   publication, it can't be in the IPR and it couldn't have

11   reasonably been raised in the IPR.  It is a very limited

12   validity attack.  Somewhat broader.

13       Point in case.  Post grant review that is also part of

14   the America Invents Act that permits challenges to a patent

15   up to nine months after they issue from the patent office, in

16   a post grant proceeding like that, the challenger can raise

17   any invalidity argument they want, and there is also estoppel

18   in post grant, but the post grant because they can raise

19   anything, any invalidity argument they have, they're not

20   limited, the estoppel is even more severe in the post grant

21   proceeding and there is a serious calculation that needs to

22   be made.

23       Here you can see how the scenarios play out.  Maybe the

24   worst one is if the PTO institutes an IPR on some but not all

25   of the asserted claims.  In that situation we know unless

1    there is summary judgment, in that situation we know that

2    there is going to need to be a trial or at least further

3    district court proceedings when the IPR proceeding ends

4    regardless of what happens in the IPR, because in that

5    hypothetical there are claims for which it was not

6    instituted.

7        But more than the fact that there would be claims in

8    litigation that were never challenged in the IPR, it raises

9    the following collateral estoppel issue.  Say the PTO

10   institutes on some but not all claims, they get to a final

11   written determination, they invalidate some and not others.

12   It really doesn't matter what they do with the claims that

13   they institute in large respect because collateral estoppel

14   is going to attach, but collateral estoppel under the IPR and

15   the AIA is claim specific.

16       Let's say there are 21 claims that we asserted.  PTO

17   institutes an IPR on ten of them.  Doesn't institute on 11 of

18   them.  And we go to trial and obviously no one's going to

19   go -- as a matter of case management, as I'm sure you all

20   know, nobody goes to trial on 21 claims.  You narrow your

21   case and you present the best case you have in the time that

22   you have with the jury.

23       And but imagine a circumstance where there are five

24   asserted claims at trial.  Two of them, two of the claims

25   were not in the IPR and three of them were.  So at trial

1    Apple is prohibited by statute from arguing about printed

2    publications and 102 and 103 to try to invalidate three

3    claims that would have emerged from that IPR, but they would

4    not be estopped by anything and probably could not be

5    estopped constitutionally from making their 102, 103 printed

6    publication arguments against the two claims for which the

7    IPR was not instituted.

8         THE COURT:  Even if they were dependent claims?

9         MR. SKIERMONT:  Any claim.  Any claim.  So, you have a

10   situation where if an IPR institutes on some but not all,

11   you've almost guaranteed a collateral estoppel headache for

12   the trial.  Far from simplifying the issues for the trial,

13   it's increased the complexity of the issues for trial because

14   now you don't just have claims and are they valid and

15   infringed and for how much, you also have to sort out, well,

16   is the defendant estopped, and what is that estoppel, and

17   what can't they say, and against what claim can't they say

18   it.

19        And as you know, Your Honor, any time you're trying to

20   instruct a jury about how they have to split the hairs when

21   counsel are talking about the same exact piece of prior art

22   but they have to pretend they didn't hear that when they're

23   thinking about claim four, but because claim one was in an

24   IPR that was instituted, then that's the one they can't

25   consider, but over here they can use that to invalidate claim

1    five because it wasn't in the IPR.  It's a nightmare.

2        There is no simplifying of anything from an IPR.  If the

3    IPR institutes -- and so, that's one good example of how

4    complexity increases, it doesn't simplify anything.  I still

5    have yet to understand from the briefing or argument what is

6    simplified.

7        Claim construction comes up -- came up in their brief

8    and came up here, but Apple contradicts their own claim

9    construction argument.  In their reply brief they point out

10   accurately that the standard for claim construction before

11   the PTAB in an IPR is what is known as the broadest

12   reasonable construction, and that is not the standard you

13   will apply in the district court in the *Markman*.  That's the

14   *Phillips* and its progeny standard that has been created for

15   district court claim construction.

16       They're not just different in label.  The PTAB has made

17   claim construction rulings and has considered claim

18   construction arguments after a district court has made a

19   claim construction ruling and ignored them for the reason

20   that the broadest reasonable interpretation standard is not

21   what the district court was applying, and so there can be as

22   much daylight in the PTO's Board in their mind as there can

23   be because we're applying two different legal standards, and

24   so you can come up with different results, no problem.

25       And so what is it that the PTAB is going to do in the

1    IPR that informs this Court or the litigation in general

2    about claim construction?  Zero.  What we will have is we

3    will have the PTAB's opinion about what the broadest

4    reasonable interpretation of the claims is and how that

5    broadest reasonable interpretation may or may not affect the

6    patentability of claims that have no presumption of validity

7    and can be invalidated based on preponderance of the

8    evidence.  Whereas, in the district court it will be the

9    *Phillips* claim construction standard with the presumption of

10   validity and can only be invalidated with clear and

11   convincing evidence.

12        So what's the PTAB doing for us on claim construction is

13   the question.  And RPI submits not much, except delaying

14   getting to the claim construction that has to be done in the

15   district court, no matter what the PTAB does with the claims

16   and the IPR proceeding, except for the caveat, as always, of

17   instituting every claim and invalidating every claim.  But

18   that's not simplification, that's ending.  And if the chance

19   that the case goes away is a reason to always grant a three

20   year stay, then a stay would always be granted because there

21   is a chance that the case goes away.  But that's why we did

22   what we did in our brief, which was it wasn't even so much to

23   ask you to peek behind the curtain as much as it was Apple

24   failed to meet their burden.  They're asking for a stay.

25   They have the burden of -- it's their burden to stay this

1   litigation.  And one of the chief pieces of evidence that
2   they offered to meet their burden were statistics that have
3   nothing to do with the petition they filed or the patent we
4   are asserting.  And so that's why we tried to dig in a little
5   bit.  Obviously it's not -- it's cursory in the sense that we
6   wanted to highlight some of the arguments we'll be making.
7   And will some claims maybe get instituted in IPR?  It may be.
8   But as the statistics go, they're going to go down as far as
9   how many are being instituted, how many claims are being
10  invalidated.  Almost they have to.  There are hundreds of
11  these being filed.

12       They're not going to just -- they're not like a big
13  gigantic law firm, they just keep hiring up people to do IPR
14  and PTAB proceedings.  At some point either those six month
15  extensions that the statute allows them to do so it's no
16  longer a 12 month thing, now it's an 18 month thing, that's
17  going to start happening with more frequency.  And the other
18  thing that's going to happen with the PTAB and controlling
19  its docket given the popularity of these petitions, they're
20  going to start denying more of them.  And this is purely
21  anecdotal but all of these statistics are essentially because
22  we have a year's worth of data points.

23       But there is two IPR petitions filed against a patent
24  holder or a patent owner that owns digital printing.  They
25  were RR Donnelley patents for digital printing.  They sued

1    several people in that industry.  The industry participant

2    defendants submitted two IPRs.  All claims challenged in the

3    petition, in both petitions rejected in their entirety on

4    December 30th.  Two petitions every claim the PTAB said not

5    instituting.  And is it an anecdote?  Yes.  But in some ways

6    the statistics have to turn from the banner year of the first

7    year when there were resources because the docket was just

8    filling up and it was novel.

9        And even the only IPR proceeding to actually go to a

10   trial in a final written determination is a perfect

11   illustration of what I was describing earlier about the lack

12   of simplification.  There the patent owner asserted eight or

13   nine claims, the PTO instituted on only three, then the three

14   were invalidated, but there were still pending claims and

15   there's still litigation and what are the estoppel issues, if

16   any.  But that litigation isn't over.  That litigation has

17   years left.

18       And what's also interesting about it to compare and

19   contrast how in some ways the patent owner and their timing

20   on these issues controls what kind of prejudice there may or

21   may not be to the patent holder from a stay.  The complaint

22   in that first IPR, the only final written determination that

23   we have, that complaint was filed four months before ours.

24   We filed the original Dynamic Advances complaint in October

25   of 2012.  The original complaint in the *Garmin* case was filed

1    four months prior in August and —— I'm sorry, in June.  It

2    was filed in June.  And so that IPR, the challenger filed

3    their initial, their petition for review, I believe it was

4    within about six months of being served with the first

5    lawsuit, it might have been a little less than that, but it

6    was basically six months.  They didn't have any of this

7    joinder business.  And even in that result the PTAB got to a

8    final written determination two months ago, so in November of

9    2013.

10        So, we aren't even going to be arguably or potentially,

11   a good potential, we won't even be to the PTAB's decision on

12   institution on Apple's IPRs in the amount of time that has

13   elapsed since we sued Apple as there was a final written

14   determination in the first one of these to get there.  That

15   illustrates how different this can go, how fast or slow it

16   can go.  We're more than a dozen months behind that first

17   one.

18        And to stay it now —— and you brought up this point,

19   Your Honor, which I want to emphasize.  It is a big deal that

20   we got on a scheduling conference to set when we were going

21   to file claim construction briefs, when RPI's professor

22   inventor was going to be deposed and what was going to have

23   to be produced and done before those events took place.  And

24   every counsel was on the phone and was talking about

25   scheduling.  We can do —— our opening briefs will be due

1  January whatever, a week from tomorrow.  Everybody agrees?

2  Agree.  We're going to take the inventor sue deposition is

3  going to be in December and RPI has to certify that it's

4  produced all of its documents before we can let that

5  deposition go forward.

6       That all happened.  All of that happened and all of that

7  was scheduled from the outset when Apple knew it had already

8  filed an IPR.  You would think that if they were going to

9  seek a stay of the litigation, that unless it is for tactical

10  advantage, they withhold it.  If it doesn't come up, it

11  doesn't come up in the hearing.  Sure, we'll schedule these

12  things.  We want to take the inventor deposition.  Maybe we

13  can use it in the IPR.  We want to get all their documents

14  because while there's discovery in the IPR, it's not like

15  discovery in litigation.  It's not free flowing.  It's

16  specific motions and certain requirements and restrictions.

17       Well, Apple solved that problem because they have all

18  our documents and they deposed our lead inventor.  And in the

19  meantime and did those things, got additional documents from

20  RPI, deposed the lead inventor.  Did those things in the

21  interim between when they filed the IPR and even brought the

22  prospect of a stay to anyone's attention, counsel or the

23  court.

24       That is precisely the kind of tactical advantage and

25  unfair or undue prejudice that wholly apart from the

34

1    specifics of an IPR, there is law about the requirements and

2    the standards under the law for staying a properly filed

3    lawsuit.  And unless there is some reason, and, in fact,

4    there is the case we cited in our brief that says unless it's

5    Apple that can show the hardship, you should deny the stay.

6         And when you combine it all between the delay of the

7    filing of the petition until the second to last day it could

8    be filed, counsel talked about the statutory scheme and what

9    it was encouraging.  Well, the statutory scheme didn't

10   provide for a stay upon filing an IPR.  They know what stays

11   are, they happen all the time in reexamination, and it's not

12   in the statute.  So that can tell you what -- that says a lot

13   about the statutory scheme and the stays in our view.

14        But more importantly, in addition to the scheme, the

15   statute by setting a one year deadline after you've been

16   served with a complaint for patent infringement when you

17   can't file an IPR was also making a legislative judgment,

18   which is at some point if there is active litigation, you

19   can't just throw the IPR bomb into the mix and that's not

20   palatable so we're going to set the deadline at 365 days.  If

21   you don't have your petition in within 365 days of being

22   sued, it's in our judgment that it's getting too long, it's

23   getting too far out, it has too much possibility for

24   disruption.

25        Well, they filed on day 363.  So they're much closer in

1    RPI's view to the statutory judgment of taking too long than

2    they are of fulfilling the statute's purpose of efficiency

3    and low cost.  And, obviously, also three IPR petitions start

4    to become comparable to the cost of litigation.  Fenwick

5    filed, the litigation counsel filed the first IPR petition.

6    New counsel, I think it's Sidley, Austin are now counsel of

7    record in the second and third IPR petitions.  That's a half

8    a million dollars in IPR petitions.  And they're talking

9    about how we shouldn't be expending resources filing our

10   claim construction briefs that both sides probably have

11   nearly complete drafts of, and so it's disingenuous at best

12   to claim resources and the rest.  When you think about what's

13   going to happen, if any claims come out of the IPR, is we

14   have another year of litigation, we have collateral estoppel

15   issues we may or may not have to deal with, and we haven't

16   been given anything from the PTAB to simplify the issues.

17   We've been given more complications.

18        And unless you have anything else, Your Honor,

19   specifically, I'll take a break.

20        THE COURT:  Give the court reporter a break.  You speak

21   quickly.  Anything you would like to reply briefly?

22        MR. MARTON:  Yes.  I'll be as brief as I can.

23   Plaintiffs' counsel has made assertions that the timing of

24   Apple's filing of its IPR petition and the fact that Apple

25   didn't mention the filing of that petition at a status

1   conference in October of 2013 indicate that there is some

2   sort of tactical misconduct here.  That is certainly not the

3   case.

4       Apple, as I explained earlier, carefully considered

5   whether or not it would file the IPR in the first instance

6   and it took its time to do that, the time it's allotted to do

7   that.  As of the time of the October status conference, Apple

8   had not decided whether or not it was even going to seek a

9   stay.  We're just not at that point.  So raising it at the

10   status conference didn't make sense.  And proceeding with

11   this litigation is our obligation until a stay is instituted,

12   so that is what we have done.

13      THE COURT:  Would you agree that there are at least two

14   cases that come to mind where courts have said that waiting

15   until the end of the one year statutory period could give

16   rise to an inference of undue prejudice or attempts to take

17   tactical advantage?

18      MR. MARTON:  I have read two cases that say -- it

19   doesn't indicate that it would be undue prejudice but it

20   would be a tactical disadvantage or some form of misconduct.

21   I don't see anything on the record here that supports any

22   kind of misconduct on Apple's part here and I think that's

23   the analysis, but I am familiar with the case law you're

24   speaking of.

25      Plaintiffs also say that it's not likely that these will

1    be instituted, that Apple's IPRs will not be instituted.  The

2    statistics are what the statistics are.  It's more likely

3    than not that at least some of the claims will be subject to

4    an IPR examination, and that's just the fact.  I mean, it is

5    more likely than not.

6         And plaintiffs' counsel also argues through hypothetical

7    scenarios that the complicated collateral estoppel issues

8    that could result from something less than a full

9    cancellation of all claims means that the IPR proceedings

10   would not offer any simplification to this trial court.  That

11   is just simply not the case.  There are different types of

12   simplification.  Certainly cancellation of one claim in some

13   instances it necessarily will simplify this case; it's one

14   claim this Court doesn't need to consider.  If all claims are

15   confirmed then estoppel provisions kick in and we consider

16   less prior art and less invalidity arguments.  And no matter

17   what happens, the proceedings will result in an expanded

18   prosecution history that will support this Court's

19   interpretation of the claims.

20        Plaintiffs' counsel also raised the issue that because

21   of the new IPR petitions, we're not certain what the schedule

22   is going to be, when the IPR petitions might be instituted,

23   if at all.  At the furthest, the latest it could possibly be

24   would be July, early July -- or actually probably late

25   June 2013 when we would have an understanding of whether or

1   not the IPRs are being instituted.  However, it is very

2   likely and certainly within plaintiffs' control to make that

3   happen earlier.  If the plaintiffs respond to the other two

4   IPRs within the next, say, three weeks, we will know by April

5   whether or not these IPRs are being instituted, whether

6   they're consolidated or not.

7        THE COURT:  If I were a cynic, which I'm not, could I

8   conceive of the possibility of yet another IPR petition which

9   as you concede could be potentially viewed as timely up until

10  June of this year and another request that the Patent and

11  Trademark Office defer on the earlier filed petitions?

12       MR. MARTON:  There is no intention to do that.  There is

13  no intention to do that.

14       And then the last point, this *Baxter* case that the

15  plaintiffs have pointed out.  That, as plaintiffs concede,

16  relates to reexaminations.  We do not know how a final

17  decision in an IPR will impact a jury verdict in this case.

18  We just don't know at this time.  That's all I have.

19       THE COURT:  Thank you.  Anything further, Mr. Skiermont?

20       MR. SKIERMONT:  Just one point, Your Honor.  Two points.

21       With respect to the potential invalidity collateral

22  estoppel, and I suggested that it was in some ways fool's

23  gold from the patent owner's perspective, and I explained

24  that in part, but what counsel's argument reminded me to also

25  point out is so it's limited to printed publications.  And if

1  you rely on particular printed publications before the PTAB,

2  you can't then -- win or lose there, you can't use them in

3  the district court litigation.

4      But there are two gaping holes in the statute, Your

5  Honor.  The first is for a 103 argument for certain.  I'm not

6  aware of any decision that has addressed this issue but I can

7  imagine a creative lawyer making it, which is we relied some

8  on printed publications before the Board on 103 and, win or

9  lose, we are now under the AIA estopped from making that

10  printed publication argument in front of the jury.  Well,

11  what if you combine it with prior use?  What if you say the

12  printed publication we relied upon in the PTAB, we're not

13  relying on it, we're estopped from relying on it like we did

14  there, but we couldn't argue prior use before the PTAB so now

15  we are.  You can't ignore the combination.  It's obviously

16  going to happen.  And so if there is any evidence of prior

17  use that cannot be brought in the PTAB, it's coming to trial

18  and it's going to come along with the 103 references that the

19  Board considered.  That's number one.

20      Number two.  The other hole, you know, kind of loophole

21  is that they are estopped from bringing references in

22  litigation of printed publications that they relied on or

23  reasonably could have relied on.  Well, you know what lawyers

24  do with reasonably could have relied on.  If Apple loses on

25  all the art they tried before the PTAB, they're not going to

40

1    just come with no art to the trial, they're going to find new

2    art that they think maybe they can argue better in front of

3    the jury and, win or lose, we're going to be briefing it,

4    you're going to be deciding it.  It's going to be we couldn't

5    have reasonably relied on this during the PTAB for X, Y and Z

6    reasons.  And that's just the way it works.  So the idea that

7    collateral estoppel is doing anything for us here is I think

8    not accurate.

9         Last, based on the scheduling.  There is another

10   important point based on the schedule.  Oftentimes district

11   court litigation has a relatively ambitious schedule that

12   fritters away through party scheduling conflicts, attorney

13   scheduling conflicts and court scheduling conflicts,

14   including Speedy Trial Act things have to happen and

15   immigration hearings.  And we are in a different circumstance

16   here because the parties have consented to Your Honor.  We

17   have more control over avoiding needless delay in our current

18   scheduling order and situation.

19        THE COURT:  Is this your way of saying I'm not very

20   busy?

21        MR. SKIERMONT:  No, Your Honor.  This is my way of

22   saying that a district court judge has things that they have

23   to move their schedule to do by law and those constraints are

24   less because we've consented to you.  That's all I have.

25        THE COURT:  Thank you.  I'm going to reserve decision.

41

1    I hope to get you a decision next week, early next week.  In

2    the meantime, we will go forward with at least the filing of

3    the initial claim construction briefs and you'll have my

4    decision shortly.  Thank you both for excellent

5    presentations.

6         THE CLERK:  Court's adjourned.

7                     *              *           *

C E R T I F I C A T I O N

       I, EILEEN MCDONOUGH, RPR, CRR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

                     Dated February 15, 2014

                     _____

                     EILEEN MCDONOUGH, RPR, CRR
                     Federal Official Court Reporter